[No. 27668-9-I.   Division One.   August 30, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. KENNETH A. WATKINS, *Appellant.*

*Elaine Winters* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Michael J. Lang, Deputy,* for respondent.

PEKELIS, J. — Kenneth Watkins appeals his conviction of one count of rape in the second degree. He claims error in the trial court's failure to conduct a preliminary inquiry to determine the competency of three prosecution witnesses.

He also contends that the trial court erred in twice continuing his speedy trial expiration date owing to the absence of standby counsel. We affirm.

## I

In August 1990, Watkins met the victim in this case, R.P., at a bus stop in Seattle. R.P. is "mildly retarded" and suffers from cerebral palsy. She has an I.Q. of 30. R.P., who at the time of trial was 27 years old, lived at an apartment complex that provided "intensive tenant support" for persons "dual-diagnosed" with developmental disabilities as well as mental health problems. R.P. was taking the drugs Navane and lorazepam "to keep her agitation . . . [and] her psychotic behavior under control."

On the bus, Watkins asked R.P. to become his girlfriend and obtained an invitation to her apartment to eat dinner. Several days after the initial visit, Watkins returned to the apartment complex looking for R.P. Tenants notified R.P.'s counselor at the complex, Mary Jane Coffron, that Watkins was looking for R.P. Coffron explained to Watkins that R.P. was retarded and had cerebral palsy, and that his presence at the apartment complex was unwelcome. Watkins stated that he had come "to mate" with R.P. When Coffron explained that this was impermissible, Watkins accused her of being a fascist and opined that R.P. ought to have freedom of choice. The police were called, but Watkins departed before they arrived. The police subsequently caught up with Watkins and told him he was not to return to the complex. The events following this incident were disputed at trial. Watkins testified that he never returned to R.P.'s apartment complex.

Two other tenants at the complex testified that they subsequently saw Watkins at the apartment complex with a knife, trying to climb through R.P.'s window. Kim Thompson testified that she first saw Watkins at the window, told Rick Osborne (another tenant), and then called the police. She testified that Osborne chased Watkins down the street. Osborne testified that he saw Watkins wearing a mask, holding

a knife, and trying to climb through the window. According to Osborne, Watkins then broke into the apartment through the front door, ran to R.P.'s room, and then left when the police arrived. Osborne testified that Watkins returned the next night and fought with him.

R.P. testified that Watkins returned to her apartment, forced his way in, and wanted to have sex with her, but that she refused. She testified that Watkins had a knife and threatened to cut her with it. According to R.P., Watkins chased her into the bedroom, hit her in the back, touched her breasts, put his penis in her mouth, bit her on the vagina, and left her apartment at 2 a.m.

Coffron testified she learned of these events from R.P. the next night when she was called again by tenants because Watkins was at the apartment complex. Coffron saw Watkins "[j]ust walking through the complex", and she proceeded directly to R.P.'s unit. At this point, R.P. explained what had happened.

Watkins was eventually arrested and charged with one count of rape in the second degree contrary to RCW 9A.44-.050(1)(a) and (b). He was arraigned on September 19, 1990. Accordingly, his speedy trial expiration date was November 18, 1990, and trial was set for November 13.

On October 15, Watkins appeared before Judge Robert Dixon on a motion to proceed pro se. After a colloquy on the record, the judge found a knowing and intelligent waiver of the right to counsel and entered an order permitting Watkins to proceed pro se. The judge also asked Watkins if he wanted an attorney as a legal adviser to assist him upon request. Watkins replied "I've got co-counsel". The public defender agreed to act in an advisory capacity, at which point the prosecutor asked for a clarification about whether the public defender would serve as a legal adviser rather than as cocounsel per se. The court explained:

> [I]t is not a situation of having co-counsel. She will not be an active participant in the trial. She will assist [defendant] in every reasonable fashion with regard to any questions [he] might have regarding this situation.

Accordingly, the judge appointed a public defender "to act in a legal advisor capacity (*not* co-counsel)."

On three occasions, the presiding judge extended Watkins' speedy trial expiration date. The cumulative effect of these orders was an extension from November 18 to November 28. On two of these occasions, the court determined that there were "unavoidable or unforeseen circumstances beyond the control of the court or the parties" based on findings that Watkins' legal adviser was (1) at trial on another matter, and (2) ill. The third extension was based on the unavailability of the prosecuting attorney. Watkins was given no notice of or opportunity to be heard on these requests for extensions.

The case came on for trial on November 28, 1990. Watkins waived his right to trial by jury, and moved to dismiss under CrR 3.3 and the speedy trial rule. The motion was denied.

At trial, R.P., Kim Thompson, and Rick Osborne each testified without eliciting any competency-based objection from Watkins. Watkins did not cross-examine Thompson or Osborne, and engaged in only a cursory cross examination of R.P.[1]

The trial judge found Watkins guilty as charged and sentenced him to a 68-month term of confinement. Watkins appeals.

## II

Watkins contends that the trial court erred by failing to determine the competency of R.P., Thompson, and Osborne because these witnesses were developmentally disabled and suffering from mental health problems. Since the issue of competency was not raised below, Watkins argues that the trial court had a duty "to sua sponte determine whether the witnesses were competent to testify" and that such an error is of constitutional magnitude.[2]

---

[1]After marking a Holy Bible as an exhibit and unsuccessfully seeking to compel R.P. to swear on it, Watkins asked her to "swear to Jesus" that he had hit her. She did, and Watkins had no further questions.

[2]In his reply brief Watkins argues that he *did* raise the issue of R.P.'s competency. However, his statement — "Your Honor, what we're dealing with is

■ In Washington, witness competency is governed by statute: "Every person of sound mind and discretion, except as hereinafter provided, may be a witness in any action, or proceeding." RCW 5.60.020.[3] The section on mental capacity provides in pertinent part as follows:

> The following persons shall not be competent to testify:
> (1) Those who are of unsound mind . . ., and
> (2) Those who appear incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly.

RCW 5.60.050. In the absence of a prior adjudication that the witness is insane, the burden of proving incompetency is upon the party opposing the witness. *State v. Smith*, 97 Wn.2d 801, 803, 650 P.2d 201 (1982) (per curiam); 5A K. Tegland, Wash. Prac., *Evidence* § 208, at 122 (3d ed. 1989).

The first subsection of the mental capacity provision, "unsound mind," refers only to those with no comprehension at all, not to those with merely limited comprehension. *McCutcheon v. Brownfield*, 2 Wn. App. 348, 354-55, 467 P.2d 868, *review denied*, 78 Wn.2d 993 (1970); 5A K. Tegland § 208, at 123. A person with a previous history of mental disorders is not necessarily incompetent. *See State v. Thach*, 5 Wn. App. 194, 199-200, 486 P.2d 1146, *review denied*, 79 Wn.2d 1012 (1971).

The general test of competency for those alleged to be of unsound mind is whether the witness understands the nature of the oath and is capable of giving a correct account of what he or she has seen and heard. *State v. Allen*, 67 Wn.2d 238, 241, 406 P.2d 950 (1965); *State v. Smith*, 30 Wn. App. 251, 254, 633 P.2d 137 (1981), *aff'd*, 97 Wn.2d 801, 803, 650

---

whether or not the person is actually competent" — was made in the course of Watkins' unsuccessful attempt on cross examination to have R.P. swear on a Holy Bible. See footnote 1. Thus, this appears to be at best an abortive attack on R.P.'s credibility, not her competency.

[3]ER 601 states that "[e]very person is competent to be a witness except as otherwise provided by statute or by court rule." This rule has been interpreted to preserve "the long-standing rules of incompetency established by statute." 5A K. Tegland, Wash. Prac., *Evidence* § 206, at 114 (3d ed. 1989).

P.2d 201 (1982) (per curiam); 5A K. Tegland § 208, at 122. In *Smith*, the Court of Appeals and the Supreme Court held that the record contained a "solid foundation" for the trial court's determination of competency where, although retarded, the witness was "able to understand the obligation to tell the truth on the witness stand, and . . . was able to relate the basic facts of the incident." 30 Wn. App. at 254; 97 Wn.2d at 803.[4]

Ordinarily, the competency of a witness is a preliminary fact question to be determined by the trial court. *See Smith*, 97 Wn.2d at 803; *State v. Froehlich*, 96 Wn.2d 301, 304, 635 P.2d 127 (1981). The determination lies within the sound discretion of the trial court and will not be disturbed on appeal in the absence of proof of a manifest abuse of discretion. *E.g.*, *Smith*, 97 Wn.2d at 803; *State v. Froehlich*, 96 Wn.2d at 304; *State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967).

Here, because no objection or request was interposed by the defendant, the trial court did not make an express inquiry or determination concerning the competency of R.P., Thompson, or Osborne. Thus, the questions we must resolve are whether the trial court was obliged to make a sua sponte competency determination and, if so, whether the assigned error is one of constitutional magnitude, which would entitle defendant to raise the issue for the first time on appeal. Because Watkins' rationale for the existence of the trial court's sua sponte duty is "the inherent authority to ensure due process", these two questions tend to merge into one issue here.

▮ In the case of witnesses Thompson and Osborne, the record is insufficient to establish a basis for a competency

---

[4]The second statutory ground for incompetence — inability to receive just impressions of the facts or to relate them truly — formerly applied only to children under 10 years of age. *See* Laws of 1986, ch. 195, § 2. Now, it appears merely to make explicit the common law test previously engrafted onto subsection (1), *i.e.*, does a witness have the ability to understand the underlying events and relate them truthfully in court? *Compare Allen*, 67 Wn.2d at 241-42 (test applied to those of unsound mind) *with State v. Gitchel*, 41 Wn. App. 820, 823-24, 706 P.2d 1091 (test applied to child witness), *review denied*, 105 Wn.2d 1003 (1985).

determination even if a sua sponte duty exists. The only indication that these witnesses might not have been competent is the fact that they resided at an apartment complex for disabled persons with mental health problems. As noted previously, the term "unsound mind", refers only to those with no comprehension at all, not to those with merely limited comprehension or a history of mental disorders. *See State v. Wyse*, 71 Wn.2d 434, 429 P.2d 121 (1967) (fact that witness attended school for the mentally retarded and was of limited mental capacity held not to constitute evidence of "unsound mind" within the meaning of the statute). Evidence of the special living arrangements of Thompson and Osborne, without more, simply does not permit the inference that they have "no comprehension at all." *Cf.* RCW 71.05-.450 ("No person shall be presumed incompetent . . . as a consequence of receiving evaluation or treatment for mental disorder . . ..").

Moreover, there is no basis in the record to suggest that these witnesses should have been examined as to their ability to understand the underlying events at the time they occurred and to testify truthfully in court. Rather, their testimony shows that they were in fact reasonably capable of recalling and recounting the events in question. Because the record does not suggest these witnesses were incompetent, Watkins has not demonstrated that there was any need for a competency hearing. Thus, the trial court did not err by failing to engage in a special inquiry into the competency of these witnesses.

As for R.P., the victim, there were some indications before she testified that she suffered from mental health problems.[5] Nonetheless, when called to testify by the prosecuting attorney, R.P. swore to tell the truth, indicated she knew the difference between the truth and a lie, and stated that she

---

[5]The information and the certification for determination of probable cause both indicated R.P. had mental disabilities and was alleged to be incapable of consent by reason of her mental incapacity. There were also references to R.P.'s mental incapacitation in opening argument. However, the testimony indicating that R.P. is mildly retarded, takes psychotropic medication, and has an I.Q. of 30 was not elicited from Coffron until *after* R.P. testified.

was going to tell the truth.[6] Her trial testimony was under-standable and reasonably consistent with the testimony of the State's other witnesses regarding the events in question. Furthermore, critical portions of her testimony against Watkins were corroborated by the testimony of both Coffron and R.P.'s treating physician, neither of whom suffered from mental disabilities.

On such a record, we believe it would be imprudent to hold that the trial court should have conducted a competency hearing. We are mindful, however, that the issue of whether the trial court must initiate a competency hearing in the absence of a request by a party is an issue of first impression in Washington. Watkins cites no pertinent authority to guide our decision as to when principles of due process might compel the trial court to make such an inquiry. We have, however, considered the approach of other jurisdictions.

In *Ingram v. State*,[7] the Indiana Court of Appeals declined to impose a sua sponte duty. In that case the victim, who testified against the defendant, was 18 years old and "enrolled in special education classes". After his conviction, defendant argued that the trial court committed fundamental error by not holding a competency hearing sua sponte.[8] The court disagreed, ruling that

> the trial judge is not required to act *sua sponte* in the area of witness competency. . . . Because the trial court had no duty to conduct a competency hearing until the matter was put at issue by one of the parties, its failure to do so *sua sponte* does not amount to fundamental error. Ingram's failure to raise the issue at the first available opportunity below, waives the issue on appeal.

(Citations omitted.) 463 N.E.2d at 486; *accord, Darnell v. Commonwealth*, 558 S.W.2d 590, 595 (Ky. 1977) ("no objec-

---

[6]Watkins relies heavily on R.P.'s answer to a particular question. At one point, the prosecutor asked of R.P. "What's a lie?"; she replied "He lies at me." This answer does not in itself put R.P.'s competency at issue.

[7]463 N.E.2d 483, 486 (Ind. Ct. App. 1984).

[8]Under Indiana law, fundamental error includes an error "of such magnitude as to deny the defendant due process." 463 N.E.2d at 485.

tion to [witness's] testimony was made and, therefore, there was no error"); *Mickens v. State*, 428 So. 2d 202, 204 (Ala. Crim. App. 1983) (because a witness is presumed competent, trial court may "rely on the adversary process and swear the witness without error if no objection is raised").

Some courts, however, have recognized that such a duty may arise in certain circumstances. In *Darnell*, for example, the Supreme Court of Kentucky commented that the trial court may have to conduct an inquiry into witness competency if the witness exhibits "manifest signs" of incompetence. 558 S.W.2d at 595; *see also State v. Kinney*, 35 Ohio App. 3d 84, 519 N.E.2d 1386 (1987) (per curiam) (where competency of witness was "clearly called into question", trial court's failure to inquire into competency held to have prejudiced defendant's right to a fair trial).[9]

Under Washington statutes and court rules, mentally retarded persons are not presumptively incompetent. Hence, absent manifest signs of incompetence, it would be inconsistent with public policy to impose upon the trial courts a sua sponte duty to inquire into the competence of witnesses with known mental disabilities, and we decline to do so. Here, because R.P. exhibited no such signs, there was no duty on the part of the trial court to inquire any further.

We conclude that, on this record, the trial court's conduct did not amount to a denial of due process. Accordingly, there was no manifest constitutional error.

## III

Next, Watkins contends the trial court erred in granting a continuance and extending his speedy trial expiration date based on the unavailability of standby counsel.

---

[9]*Kinney* is plainly distinguishable from this case because in *Kinney* the testimony had already revealed that the child witness was severely mentally retarded and that she would sometimes make things up as a way of reaching out for help. Accordingly, the court held that the witness's competency "was clearly called into question *by the time she was called to testify*." (Italics ours.) 35 Ohio App. 3d at 86. The court also noted that her trial testimony contained "several instances of inconsistent answers to the same question." 35 Ohio App. 3d at 86. Furthermore, the term "of unsound mind" in Ohio's competency statute expressly includes "all forms of mental retardation." *Kinney*, 35 Ohio App. 3d at 86 (citing R.C. § 1.02(C)). Thus, unlike the law in Washington, evidence of retardation creates under Ohio law a statutory presumption that the witness is "of unsound mind".

■ CrR 3.3 is designed to protect the constitutional right to a speedy trial. *State v. Mack*, 89 Wn.2d 788, 791-92, 576 P.2d 44 (1978). When the trial does not begin on the date set, the trial court is permitted to extend the speedy trial expiration date for up to 5 days "because of unavoidable or unforeseen circumstances beyond the control of the court or the parties". CrR 3.3(d)(8). Watkins concedes that if the attorney for the defendant is unavailable, a 5-day extension under CrR 3.3(d)(8) is ordinarily justified. *See State v. Eaves*, 39 Wn. App. 16, 20-21, 691 P.2d 245 (1984). The trial court's decision to grant an extension is reviewed under the abuse of discretion standard. *State v. Greene*, 49 Wn. App. 49, 55, 742 P.2d 152 (1987).

Watkins contends that the trial court abused its discretion here because Watkins was not represented by counsel, but instead was proceeding pro se. He also contends that the trial court's action denied him his right of self-representation. Watkins points out that he was not informed of the extensions, nor was he present when they were issued. He claims that he was ready to proceed without his standby counsel when his case came on for trial.

■ The use of "standby counsel" was recognized by the United States Supreme Court in *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975). Holding that a criminal defendant has the constitutional right to self-representation, the Court made the following reference to the use of standby counsel:

> Of course, a State may — even over objection by the accused — appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.

422 U.S. at 835 n.46. Thus, it is clear that the trial court can appoint standby counsel without the consent of a criminal defendant, and that the mere presence of standby counsel does not infringe a defendant's constitutional right to self-representation.

Here, standby counsel had already been deemed necessary and appropriate by Judge Dixon. If the trial court can con-

stitutionally compel the presence of standby counsel over a defendant's objection, then it can legitimately exercise its discretion to grant a continuance until standby counsel is prepared to discharge his or her tasks. Regardless of whether the pro se defendant is present, this does not constitute an infringement of the right of self-representation.

We believe it was entirely reasonable for the presiding judge to conclude, in the light of Judge Dixon's order, that standby counsel should be present at the commencement of trial. Thus, the absence of standby counsel presented an adequate justification for a speedy trial extension under CrR 3.3(d)(8). We conclude that the trial court did not abuse its discretion.

Affirmed.

WEBSTER, C.J., and FORREST, J., concur.